Filed 6/10/26  P. v. Moore CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ROBERT DAVID MOORE,<br><br>  Defendant and Appellant. | F089075<br><br>(Super. Ct. No. 22CR-01026)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Steven K. Slocum, Judge.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Viktoriya Chebotarev, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On February 18, 2022, Robert David Moore repeatedly hit D. Goates on the head with a hammer, and she died from her injuries.  At trial, the trial court instructed the jury with CALCRIM No. 625, which states: "You may consider evidence, if any, of the

defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted[.]" Over defense counsel's objection, the court modified the instruction to include the following statement: "Voluntary intoxication can only negate express malice, not implied malice."

On appeal, Moore argues that the trial court erred by modifying CALCRIM No. 625 because the modification erroneously instructed the jury that his voluntary intoxication could not negate premeditation or deliberation. The People disagree. We affirm.

## PROCEDURAL HISTORY

On October 2, 2024, the District Attorney of Merced County filed an amended information charging Moore with first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189; count 1); resisting an executive officer (§ 69; count 2); and vandalism resulting in damage of $400 or more (§ 594, subd. (a); count 3). As to count 1, the amended information alleged that Moore personally used a deadly weapon (§ 12022, subd. (b)(1)).

On October 17, 2024, Moore was found guilty by a jury on counts 1 and 3. The jury also found true the weapon enhancement. As to count 2, Moore was found not guilty of resisting an executive officer, but guilty of the lesser included offense of resisting a peace officer (§ 148, subd. (a)(1)).

A jury trial was then held on the issue of Moore's sanity at the time he committed the crimes. On October 21, 2024, the jury found Moore was sane.

On December 13, 2024, Moore was sentenced to an aggregate term of 27 years four months to life.

On December 16, 2024, Moore timely filed a notice of appeal.

---

[1] All further undesignated statutory references are to the Penal Code.

2.

# FACTUAL SUMMARY

**The Prosecution's Case**

Moore, who was 51 years old in February of 2022, lived with his mother, C. Walter, and her partner, D. Goates. Up until about November of 2021, Moore was "extremely" helpful around the house. Then, he started using drugs again. He also had mental health issues.

Moore and Goates initially got along, but the relationship deteriorated. Goates told Walter she did not want Moore living with them anymore, and she began "really pressuring" Walter to evict Moore starting in about January of 2022. Walter then began asking Moore to find somewhere else to live.

On February 16, 2022, Walter once again asked Moore to find somewhere else to live. Moore got upset and broke his phone. He stated, " 'I don't need the phone. I'm going to prison. I'll take care of her tonight. I'll take care of her.' " After that Walter began locking their bedroom door, but she never thought that Moore would kill Goates.

On February 18, 2022, Moore found an eviction notice prepared by Walter. After seeing the notice, he became angry. He said, " 'Are you f[**]king kidding me. Are you f[**]king kidding me.' " He then walked to his room. A couple minutes later, he came out of his room. He said, " 'I warned you[,] I warned you,' " and he started walking toward the garage. Walter followed him.

Moore went to where Goates was standing in the garage and hit her on the head with a hammer. She fell, and he continued hitting her on the head with the hammer. Walter tried to pull Moore away, and she eventually succeeded. Moore raised the hammer and said, " 'Mom, leave me alone. Leave me alone or I'll finish her right now.' "

Walter got her phone so she could call for help, but Moore took it from her. He also took Goates's phone. Walter had to go to a neighbor's house to get help. Moore left a couple minutes after Walter, riding his electric bike.

3.

Thomas Griffin, a police officer with the Livingston Police Department, was dispatched to the scene. He located Goates, who was covered in blood. He asked her what happened and who hurt her. She answered, "I don't know," to both questions. He also asked her if it was "the son," and she said, "No." She appeared to be dazed and confused, like she did not know what was happening. She was subsequently transported to a hospital.

Later that day, law enforcement officers located Moore in a nearby orchard. Hector Becerra, a police officer with the Livingston Police Department, as well as Merced County Sheriff's Office deputies Dustin Bender and Shay Muirbrook, approached Moore. The officers announced themselves and told Moore to stop, but he ran. The officers chased him. As he ran, he threw a lighter and a methamphetamine pipe over a fence. Eventually, Bender caught up to him and he turned to face Bender. He had a box-cutter in his hand, so Bender pushed him to the ground. He swung the box-cutting tool at Bender's leg, so Bender deployed his taser. Moore still did not comply, so Bender deployed his taser again. Moore was then placed in handcuffs. Subsequently, Griffin took custody of Moore. Griffin observed Moore's erratic hand movements, which were similar to what he had observed with people who were under the influence of a stimulant, such as methamphetamine.

Moore was taken to a hospital. While at the hospital, he told Griffin, "Doesn't matter, my life[']s over anyway. You know it and I know it. I'll probably never spend a day out of jail again. You know it and I know it. It is what it is." At the time, Moore was coherent and "pretty calm."

A couple days later, Walter called the police to report that her laptop, which Moore had been using, had been destroyed by a hammer. She found it on Moore's bed. She had purchased the laptop for $1,400.

Approximately 18 days after the incident, Goates died from her injuries.

**Moore's Case**

Moore testified on his own behalf. According to Moore, he felt depressed and heard voices in his head since he was a teenager. He began using methamphetamine in his early twenties, which helped him feel less depressed. He stopped using for about seven and a half years, but he started using again about six months before the incident.

Moore did break his phone after Walter told him he needed to find somewhere else to live, but he did not say anything about going to prison and he never said anything about hurting Goates.

On the day of the incident, Moore saw the eviction notice and he felt angry. He went into his room and started smoking methamphetamine. He "just kept hitting and hitting and hitting." His next clear memory was of Walter yelling at him to get out of the house. He did not remember picking up a hammer or hitting Goates with it, but he had never had thoughts of killing her.

He did remember walking and running away from law enforcement, but he did that because he initially thought they were "shadow monsters." He did not realize they were law enforcement until after the taser was deployed. And while he was holding a box cutter because a dog had snuck up on him, he never swung it at the officers.

He also remembered being at the hospital, but he did not remember saying that he would spend the rest of his life in jail.

As to the laptop, Walter gave it to him, and he broke it about a week before the incident.

Moore also called Teresa Vince, a licensed marriage and family therapist, to testify. Vince assessed Moore after he was arrested. She provisionally diagnosed him with depression. She also referred him to a psychiatrist to rule out major depressive disorder.

**The Prosecution's Rebuttal**

Michael Zimmerman, a psychologist, interviewed Moore in October of 2022. Moore told Zimmerman that after he received the eviction notice, he " 'just lost it.' "

## DISCUSSION

## I. Additional Background

When discussing jury instructions with the parties, the trial court informed them it added the following pinpoint instruction to CALCRIM No. 625: "voluntary intoxication can only negate express malice[,] not implied malice." Defense counsel objected to the pinpoint instruction, arguing it only applied to cases involving a *Watson* murder[2] and it would confuse the jury regarding how to apply CALCRIM No. 626 (which involves voluntary intoxication that causes unconsciousness). The court overruled the objection and instructed the jury with a modified version of CALCRIM No. 625, as follows:

> "You may consider evidence, if any, of [Moore's] voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether [Moore] acted with an intent to kill, or [Moore] acted with deliberation and premeditation, or [Moore] was unconscious when he acted, or [Moore] had knowledge that Dustin Bender and Shay Millbrook were peace officers.

> "A person is *voluntarily intoxicated* if he becomes intoxicated by willingly using any intoxicating drug knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

> "Voluntary intoxication can only negate express malice, not implied malice.

> "You may not consider evidence of [Moore's] voluntary intoxication for any other purpose."

---

[2] (See *People v. Munoz* (2019) 31 Cal.App.5th 143, 152 ["Under certain circumstances, malice may be implied when a defendant kills someone while willfully driving under the influence of alcohol, thus subjecting the defendant to a charge of murder. [Citation.] This is 'colloquially known as a *Watson* murder' after [*People v.*] *Watson* …, 30 Cal.3d 290[.]"].)

Subsequently, the parties presented their closing arguments.  During her closing, defense counsel argued that "the Court specifically instruct[ed] you that you may consider evidence of [Moore's] voluntary intoxication….  The fact that he was voluntarily intoxicated can be used to negate the fact that he had an intent to kill.  It can be used to negate the fact that he did not act with deliberation and premeditation or that he was unconscious when he acted."  The prosecutor did not object or otherwise dispute this summary of the instruction.

## II.      Applicable Law

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  Malice can be express or implied.  Malice is express when the defendant intends to kill the victim.  (§ 188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114-1115.)  Implied malice has " ' "both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.[3]'  [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and … acts with conscious disregard for life.' " ' " (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

" 'In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.  [Citation.] Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is " 'whether the ailing instruction … so infected the entire trial that the resulting conviction violates due process.' " [Citation.]  " '[A] single instruction to a jury may not be judged in artificial

---

**3**  "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989.)

isolation, but must be viewed in the context of the overall charge.' " [Citation.] If the charge as a whole is ambiguous, the question is whether there is a " 'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution.' " " (*People v. Mills* (2012) 55 Cal.4th 663, 677.)

## III.    Standard of Review

" 'We review a claim of instructional error de novo.' " (*People v. Parker* (2022) 13 Cal.5th 1, 66.) However, " '[i]nstructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

Depending upon the basis of the claimed instructional error, we review it for harmlessness under either *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Under the more stringent *Chapman* standard, which applies to errors of constitutional dimension, reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman, supra*, at p. 24.) Under the alternative *Watson* standard, which applies to errors of state law, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred. (*Watson, supra*, at p. 836.)

## IV.    Analysis

Moore argues that the trial court erred by modifying CALCRIM No. 625 because by instructing the jury that voluntary intoxication can only negate express malice, the jury was effectively instructed that voluntary intoxication cannot negate premeditation or deliberation. The People argue that Moore forfeited this claim, that the court did not err, and that any error was harmless.

Even assuming Moore did not forfeit this claim, we agree with the People that the trial court did not err. The court instructed the jury that there "are two kinds of malice aforethought, express malice and implied malice." The court subsequently instructed the

jury that they could consider evidence of Moore's voluntary intoxication "only in deciding whether [Moore] acted with an intent to kill, or … with deliberation and premeditation[.]" The court then clarified that "[v]oluntary intoxication can only negate express malice, not implied malice."

Read in context and in light of the instructions as a whole, the pinpoint instruction informed the jury that voluntary intoxication could negate only one of the two kinds of malice (express malice). The instruction does not suggest, directly or indirectly, that voluntary intoxication cannot be used to negate deliberation or premeditation. In fact, the court directly informed the jury that it could be so used.

Moreover, "we consider the arguments of counsel in deciding whether the jury misunderstood the instructions." (*People v. Huggins* (2006) 38 Cal.4th 175, 193.) And here, while not the model of clarity, defense counsel specifically argued that voluntary intoxication could be used to negate deliberation and premeditation, and the prosecutor did not challenge this assertion.

Accordingly, when viewing the instructions as a whole and considering the arguments of counsel, there is not a reasonable likelihood that any member of the jury applied the instruction in the manner argued by Moore. (*People v. Solomon* (2010) 49 Cal.4th 792, 822 [" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' "].)

In arguing otherwise, Moore relies on *Francis v. Franklin* (1985) 471 U.S. 307 (*Franklin*). He asserts that, pursuant to *Franklin*, the accurate general instruction in CALCRIM No. 625 that the jurors could consider his voluntary intoxication "in deciding whether [he] … acted with deliberation and premeditation" cannot cure the defect in the conflicting specific pinpoint instruction. This argument is not persuasive. The pinpoint instruction does not conflict with CALCRIM No. 625. Rather, the pinpoint instruction clarifies that while voluntary intoxication can negate express malice, it cannot negate

implied malice.  Moreover, the pinpoint instruction accurately states the law.  (See *People v. Parker* (2025) 113 Cal.App.5th 1261, 1269 ["Evidence of voluntary intoxication cannot be used to negate implied malice."].)

Therefore, based on the foregoing, Moore's claim fails.

### **DISPOSITION**

The judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

LEVY, Acting P. J.

DE SANTOS, J.

10.